1

2

3                                          **E-FILED on** 12/21/06

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                              SAN JOSE DIVISION

11

12   KENNETH E. DAUB,                        No. C-05-01055 RMW

13              Plaintiff,                    ORDER GRANTING DEFENDANT EAGLE
                                             TEST SYSTEMS, INC.'S MOTION FOR
14       v.                                  SUMMARY JUDGMENT

15   EAGLE TEST SYSTEMS, INC., a corporation, **[Re Docket No. 45]**
     and LEONARD FOXMAN,
16
              Defendants.
17

18

19       Defendant Eagle Test Systems, Inc. ("Eagle") moves pursuant to Fed. R. Civ. P. 56 for

20   summary judgment on plaintiff Kenneth E. Daub's ("Daub") breach of contract and age

21   discrimination claims.  Daub opposes the motion.  The court has read the moving and responding

22   papers.  For the reasons set forth below, the court GRANTS Eagle's motion for summary judgment.

23                              **I.  BACKGROUND**

24       **A.      The Parties**

25       The present action is a suit by Daub for breach of contract of employment, fraud, promissory

26   fraud, unjust enrichment, and wrongful termination of employment based on age discrimination.

27   Eagle designs, manufactures, and sells test equipment for semiconductor companies and is Daub's

28   former employer.  Defendant Leonard Foxman founded Eagle, is the chief executive officer of

*Left margin (vertical text):* **United States District Court**  For the Northern District of California

ORDER GRANTING DEFENDANT EAGLE TEST SYSTEMS, INC.'S MOTION FOR SUMMARY JUDGMENT—No.
C-05-01055 RMW
SPT

**United States District Court**
For the Northern District of California

1   Eagle, and handled sales and sales operations at Eagle prior to and, to some extent, during Daub's

2   employment there.  Eagle's fiscal year ends September 30.  Ted Foxman is Leonard Foxman's son

3   and serves as Eagle's chief operating officer responsible for operations, product development,

4   information technology, and manufacturing.  In September 2003 TA Associates purchased sixty-two

5   and one half percent of the outstanding shares of Eagle for $95 million.  Decl. of Ryan J. Larsen

6   Supp. Def.'s Mot. Summ. J. ("Larsen Decl."), Ex. G (McJunkin Depo.) at 34:3-13.  Two officers of

7   TA Associates were added to Eagle's board of directors: Mike Child and Jameson Jones McJunkin.

8   *Id.* at 27:8-16.

9        Daub was hired by Eagle as Vice President of Sales on January 8, 2001.  AC, Ex. 1 (Daub

10  offer letter) at 2; Decl. of Robert H. Bohn Opp. Def.'s Mot. Summ. J. ("Bohn Decl."), Ex. A (Daub

11  Depo.) at 19:10-22.  He was sixty-four years old at the time.  When he was first hired, Daub was

12  vice president responsible for world wide sales.  Bohn Decl., Ex. A (Daub Depo.) at 125:8-10.

13  About eight months later his role was changed to vice president of North America sales.  *Id.* at

14  125:10-11.  This occurred after Daub had hired a sales person for Europe and a sales person for

15  Asia.  *Id.* at 125:11-14.  In September 2002 Eagle changed Daub's role to vice president of western

16  region sales.  *Id.* at 126:1-4.  Daub's employment with Eagle was terminated December 1, 2004.[1]

17  Daub was sixty-eight years old at the time.  Prior to working at Eagle, Daub worked for LTX Corp.,

18  one of Eagle's competitors.  *Id.* at 30:7-8.  Daub was terminated from his employment at LTX.

19        **B.    Terms of Daub's Initial Offer Letter**

20        As stated in Eagle's employment offer letter, Daub's responsibilities included "Strategic Sales

21  & Marketing on World Wide Basis," "Develop 'Top Notch' Field Sales & Marketing Infrastructure,"

22  and "Develop Strategic Customer Alliances."  AC, Ex. 1 at 2.  The offer letter is dated December 27,

23  2000 and required acceptance from Daub by December 28, 2000.  *Id.* at 5.  The letter sets forth

24  Daub's compensation structure, including his eligibility for incentive bonuses and certain rights

25

26

27  [1]      According to Daub's declaration, his employment was terminated December 2004, Decl. of
    Kenneth Daub Opp. Def.'s Mot. Summ. J. ("Daub Decl.") ¶ 1, but in his deposition he states he was
28  terminated November 2004.  Bohn Decl., Ex. A (Daub Depo.) at 19:10-22.

ORDER GRANTING DEFENDANT EAGLE TEST SYSTEMS, INC.'S MOTION FOR SUMMARY JUDGMENT—No.
C-05-01055 RMW
SPT                                                      2

1   under a change of control provision.[2]  Daub accepted the December 27, 2000 offer in writing via a

2   December 28, 2000 e-mail to Leonard Foxman.  Larsen Decl., Ex. H at 404 (Daub Depo. Ex. 13).

### 1.    Incentive Bonus–New Account Component

4       Daub's offer letter indicates that he would be eligible for an incentive bonus for "new

5   accounts."  The description of this incentive bonus provides:

> For each new account (account not previously doing business with Eagle Test) that
> you successfully introduce to Eagle Test resulting in additional business you will
> receive a bonus during the first year of that business in an amount calculated to be
> equal to 2% (two percent) of the first $2.0 million of revenue received by Eagle Test.

*Id.* at 3.

### 2.    Incentive Bonus–Stock Purchase Component

10      The description of the incentive bonus also provides that Daub may use his incentive bonus

11  to purchase Eagle stock held by Foxman, subject to certain conditions:

> A Bonus Plan as shown in "Exhibit A" attached.  Bonus earned with this portion of
> compensation may be used to purchase stock according to conditions as outlined in
> Exhibit B.  Note: This compensation is subject directly to the Employee's willingness
> to enter into non-compete, non-solicitation, and performance agreements to be
> determined by mutual consent of Company and Employee.

*Id.* at 3-4.

16      A form of an "Incentive Bonus/Stock Option/Restriction/Non-Compete Agreement" among

17  Daub, Eagle, and Leonard Foxman ("Incentive Bonus Stock Option Agreement") is attached as

18  Exhibit B to the December 27, 2000 offer letter.[3]  *Id.* at 6-17.  This form of agreement describes the

19  arrangement as "a bonus arrangement coupled with an obligation to purchase certain shares of the

20  common capital stock of the Company."  *Id.* at 6 ¶ B.  Under the arrangement, Eagle and Leonard

21  Foxman would agree to grant to Daub "the right and option to purchase from Foxman . . . on the

22  terms and conditions hereinafter set forth" a maximum number of 230.24 shares of stock owned by

---

[2]      Daub's compensation as described in the offer letter also included a pension plan into which
the company was to make annual contributions regardless of profit levels.  These pension benefits
were not to vest until the fifth anniversary of employment, at which time the benefits would vest
completely.  AC, Ex. 1 at 3.  The company also was to make annual contributions to a profit sharing
plan and an employee stock ownership plan (ESOP), which contributions were dependent upon the
company's profit levels.  *Id.*  Benefits under the profit sharing and ESOP were not to vest until the
fifth anniversary of employment, at which time they would vest completely.  *Id.*

[3]      Exhibit A of the offer letter was not submitted to the court with the complaint.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

Leonard Foxman, subject to certain adjustments.  *Id.* at 7 ¶ 4.1.  The conditions of the stock purchase include (1) Daub's agreement to "terminate all other bonus and/or bonus agreements between himself and the Company, if any," *id.* at 6 ¶ D; *see also id.* ¶¶ C; *id.* at 7 ¶ 3.2, and (2) Daub's agreement to a two year covenant not to compete following termination of employment with Eagle.  *Id.* at 14 ¶¶ 7.1-7.2.  Further, section 4.2 of the form of agreement provides that the arrangement may be deemed to have been automatically exercised under certain circumstances:

> Daub hereby accepts the foregoing option and agrees with Foxman and the Company that he will automatically be deemed to have exercised the option to purchase the Option Shares to the extent that the purchase price for the Option Shares (as determined below) shall be equal to the lesser of forty (40%) percent [sic] of the Bonus or the purchase price for the number of Option Shares at any time remaining available to be purchased without further notice (the "Annual Purchase").  However, in no event, shall Daub have an option to purchase . . . in excess of the Maximum Number of the Option Shares unless otherwise agreed by the Company and Foxman.

*Id.* at 7-8 ¶ 4.2.

### 3. Recruiting Bonus

To the extent Daub introduces candidates that Eagle hires for the positions of sales manager at Eagle's Chicago facility, design engineer, or applications engineer, his offer letter provides for a bonus of $10,000 for the sales manager position and $5,000 for the other positions at the one year service anniversary of the hired candidate.  *Id.* at 4.  No bonus is due if the candidate leaves for any reason prior to the one year service anniversary.  *Id.*

### 4. Change of Control Provision

Daub's offer letter also sets forth a change of control and severance benefits provision.  For purposes of the provision, change of control is defined as "a change of majority ownership or material change of corporate form which results in the establishment of a board of directors and places decisions regarding the operation of daily business matters and personnel management with the resulting corporate form."  *Id.* at 4.  The provision provides that in the exclusive event of a change of control an employee terminated without cause shall be entitled to certain severance benefits, including an amount equal to the employee's annual base salary.  *Id.*

### C. Compensation Terms Pursuant to September 20, 2002 Letter

According to Eagle, upon Daub's change in role to vice president of western region sales

United States District Court

For the Northern District of California

Eagle restructured Daub's compensation package.  Specifically, an unsigned September 20, 2002 letter from Leonard Foxman indicates that in the new role (1) Daub is to report to Dave Miller who formerly reported to Daub, (2) Daub is to supervise the three western area account managers, and (3) Daub is to oversee the Eagle sales accounts in the western region and develop new accounts. Larsen Decl., Ex. H at 399 (Daub Depo. Ex. 4).  According to the letter, Daub continues to be eligible for the pension plan, profit sharing plan, and ESOP.  *Id.* at 400.  Daub is to receive the same annual base salary and the same change of control provision applies.  *Id.* at 400, 402-03.  In addition, Daub's incentive bonus starting October 1, 2002 would consist of three components.  *Id.* at 401. First, Daub would be eligible to receive an incentive bonus of 10% of the total commissions paid to western region account managers under Daub's direction in his new role, to be paid quarterly.  *Id.* Second, Daub would be entitled to an incentive bonus of 3% of the commissions paid to representatives of Syntek-Pacific Northwest, to be paid quarterly.  *Id.*  Third, Daub would be eligible to receive 0.3% of overall corporate profits (net of all operating costs) "for the fiscal year beginning on October 1, 2002" and is to be paid on December 15, 2002.[4]  *Id.*  The letter states that it replaces and supersedes all previous offers, written, verbal, or implied.  *Id.* at 403.

Daub disputes that the September 20, 2002 letter restructured his compensation package, and contends that he never saw the letter and it "first turned up after [his] termination."  Bohn Decl., Ex. A (Daub Depo.) at 127:7-10.  He argues, instead, that around September 2002 when his role was changed to vice president of western region sales Ted Foxman verbally informed him only that he would begin receiving an additional compensation element based on a percentage of commissions earned by account managers in the western region.  Bohn Decl., Ex. A (Daub Depo.) at 125:11-128:11.  However, Daub acknowledges that Eagle changed his title, gave him new business cards and told him to focus on the Western Region.  Pl.'s Opp. Def.'s Mot. Summ. J. at 5:23-24.  He also admits he received commission payments under a new structure.

---

[4]     Eagle notes that the letter contained a typo and the payment was intended to be on December 15, 2003 since the bonus was intended to be based on the corporate profits for the fiscal year beginning October 1, 2002 and ending September 30, 2003.  Daub argues that because he was paid on December 15, 2003, he was paid a year late.  Regardless, an obvious typographical error does not create a genuine issue of material fact as to any of plaintiff's claims.

ORDER GRANTING DEFENDANT EAGLE TEST SYSTEMS, INC.'S MOTION FOR SUMMARY JUDGMENT—No. C-05-01055 RMW
SPT

United States District Court

For the Northern District of California

### D.    Ageist Comments

About two years into Daub's employment at Eagle Leonard Foxman commented that Daub is "made up of cuts and jumpers."  Bohn Decl., Ex. A (Daub Depo.) at 17:24-18.  According to Daub, cuts and jumpers are "modifications to a circuit board to make it function correctly."  *Id.* at 20:13-16. Daub contends that Leonard Foxman made the comment in a derogatory manner and "kind of in a slanderous way of an age issue."  *Id.* at 20:9-10.  On another occasion, in response to Daub's recommendation of a former colleague who had since retired from Schlumberger for a sales position at Eagle, Leonard Foxman stated words to the effect that "if he's been retired from Schlumberger, he's too old to be effective at Eagle."  *Id.* at 21:1-8.  After a meeting, Leonard Foxman made a comment to Daub that all of Daub's contacts are retired, which Daub submits is untrue.  *Id.* at 22:21-22.  When Ted Foxman decided to terminate the employment of an employee under his indirect supervision he stated to Daub (1) the employee is too old to be effective at Eagle, (2) it would cost the company a lot of money if the employee's employment was not terminated before his fifth year, and (3) the employee was not generating enough business.  *Id.* at 38:11-19, 39:1-25.  Next, a former employee who was in a restaurant with Leonard Foxman and Daub testified that Foxman stated to Daub "Ah, we're too old for this, huh, Ken?  We're getting too g------ old for this.  I'm too old for this s---. . . .  You're too old for this c---, too."  Bohn Decl., Ex. 4 (Thomas Mordue Depo.) at 41:10-19.  Finally, in terminating his employment, Leonard Foxman sent a memorandum to the company characterizing Daub's termination of employment as a retirement without Daub's consent.

## II.  ANALYSIS

### A.    Legal Standard

Summary judgment is proper when the pleadings, discovery, and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  *Id.*  In a motion for summary judgment, the court draws all reasonable inferences that may be taken from the underlying facts in the light most favorable to the nonmovant.  *Matsushita Elec.*

United States District Court

For the Northern District of California

1   *Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  A party moving for summary

2   judgment who does not have the ultimate burden of persuasion at trial has the initial burden of

3   producing evidence negating an essential element of the non-moving party's claims or showing that

4   the non-moving party does not have enough evidence of an essential element to carry its ultimate

5   burden of persuasion at trial.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th

6   Cir. 2000).  If the moving party carries its burden of production on the motion, "the nonmoving

7   party must produce evidence to support its claim or defense.  If the nonmoving party fails to produce

8   enough evidence to create a genuine issue of material fact, the moving party wins the motion for

9   summary judgment."  *Id.* at 1102-03 (citations omitted).

10          **B.      Breach of Contract Claim**

11                 As an initial matter, plaintiff again argues that Daub's employment with Eagle was not at-will

12   and the court's October 19, 2005 order Denying in Part and Granting in Part Defendants' Motion to

13   Dismiss erred in ruling that Daub was an at-will employee.  Plaintiff did not file a motion for

14   reconsideration.  Moreover, plaintiff's argument that the offer letter included conflicting provisions

15   because it contained the terms "at-will" and "for cause" is without merit.  The offer letter plainly

16   states that Daub's employment is at-will and the term "for cause" is defined solely in the context of

17   the change in control provisions.[5]  Plaintiff's failure to acknowledge the plain text of the offer letter

18   does not create a genuine issue of material fact.

19                 The parties do not dispute that Daub's breach of contract claim based upon the offer letter is

20   governed by the laws of the state of Illinois.  *See* AC, Ex. 1 at 5.  To establish a breach of contract, a

21   plaintiff must establish the following elements: "(1) the existence of a valid and enforceable

22   contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant

23   injury to the plaintiff."  *Zirp-Burnham, LLC v. E. Terrell Assocs., Inc.*, 356 Ill. App. 3d 590, 600

24   (2005) (citation and quotations omitted).

25

26   _____

27   [5]      Plaintiff's argument that the court's consideration of the offer letter in a motion to dismiss
    was erroneous is not supportable.  Plaintiff's pleadings relied upon the offer letter, and the letter was
28   attached as an exhibit to plaintiff's complaint.

ORDER GRANTING DEFENDANT EAGLE TEST SYSTEMS, INC.'S MOTION FOR SUMMARY JUDGMENT—No.
C-05-01055 RMW
SPT                                                              7

**United States District Court**
For the Northern District of California

1   **1.      Incentive Bonus–New Account Component**

2          Plaintiff's claim that Eagle breached the compensation provisions of his offer letter rests on

3   his contention that Leonard and Ted Foxman verbally promised that "new accounts" for purposes of

4   computing Daub's incentive bonuses are not limited to "accounts not previously doing business with

5   Eagle," as stated in Daub's offer letter.[6]  Eagle argues that there is no genuine issue of material fact

6   as to the definition of "new accounts" for purposes of computing bonuses to which Daub was

7   entitled while employed at Eagle.  Daub does not dispute that his offer letter defines a "new account"

8   for purposes of computing his incentive bonus as an "account not previously doing business with

9   Eagle Test").  AC, Ex. 1 at 3.  However, Daub argues that Leonard and Ted Foxman verbally

10  promised him that the definition of "new accounts" for purposes of computing his incentive bonus

11  would include getting certain existing customer's new products on an Eagle tester.  Bohn Decl., Ex.

12  A (Daub Depo.) at 82:4-83-6.  In support, plaintiff testifies that such a verbal promise was made

13  after he received his offer letter on December 27, 2000 and before he accepted it on December 28,

14  2000.

15         Eagle points to Daub's written acceptance of the December 27, 2000 offer letter.

16  Specifically, when Daub accepted the December 27, 2000 offer in writing the day after receiving it

17  as requested by Eagle, he did not indicate that the definition of "new account" was no longer as

18  described in the written offer letter.  Larsen Decl., Ex. D (Daub Depo.) at 82:4-83:19, 87:4-12;

19  Larsen Decl., Ex. H at 404-05 (Daub Depo. Ex. 13).  Rather, Daub indicated, without qualification,

20  his acceptance of the December 27, 2000 letter, which was attached to his acceptance.  Larsen Decl.,

21  Ex. H at 404-05 (Daub Depo. Ex. 13).  There is no reference to any verbal promise or discussion

22  revising the definition of "new accounts" as stated in the offer letter, or any written revision made to

23  the offer letter.  *Id.*, Larsen Decl., Ex. D (Daub Depo.) at 83:13-19.  Even viewing these facts in the

24  light most favorable to plaintiff, the court does not find that there is a genuine issue of material fact

25  that the definition of "new accounts" for the purpose of computing Daub's incentive bonus is other

26  than as stated in the written offer letter accepted by Daub.  Daub cannot alter the definition of "new

27

28  [6]      Daub contends that he was not paid for bonuses owed to him for Eagle's fiscal year 2004 and
    for commissions for Eagle's fiscal year 2003 and 2004.  Daub Decl. ¶¶ 3-4.

ORDER GRANTING DEFENDANT EAGLE TEST SYSTEMS, INC.'S MOTION FOR SUMMARY JUDGMENT—No.
C-05-01055 RMW
SPT                                                      8

accounts" by showing that some different meaning was discussed before the employment offer was accepted, particularly given that the letter contained an integration clause.  *See Weber v. DeKalb Corp., Inc.*, 265 Ill. App. 3d 512, 518 (1994).

### 2.      Incentive Bonus–Stock Purchase Component

Plaintiff argues he is entitled to 4% of the issued capital stock of Eagle pursuant to the Incentive Bonus Stock Option Agreement attached to his initial offer letter.  Eagle argues that there is no genuine issue of material fact as to the existence of a valid, enforceable contract pursuant to which Daub has owed any right to purchase stock under an Incentive Bonus Stock Option Agreement.  In particular, Eagle submits that Daub never executed the Incentive Bonus Stock Option Agreement, a form of which was attached to his offer letter.  Plaintiff does not dispute that he did not sign an Incentive Bonus Stock Option Agreement, but rather argues that his offer letter provides that the stock purchase option would be automatically exercised. Pl.'s Opp. at 6:3-5. Plaintiff's contention is misleading as the offer letter does not so provide and his claim is not otherwise supported by the evidence submitted by plaintiff in opposition to the motion for summary judgment.

The provision for automatic purchase is not in the offer letter as plaintiff states in his opposing brief, but rather is a provision of the Incentive Bonus Stock Option Agreement (*see* AC, Ex. 1 at 7-8 ¶ 4.2).[7]  Absent an executed Incentive Bonus Stock Option Agreement, the automatic purchase provision is not valid and enforceable.  To the extent plaintiff relies on the terms in the form of agreement attached to the offer letter, the court does not find the unexecuted form of the agreement to represent a valid, enforceable contract.  Moreover, the automatic purchase provision in section 4.2 of the Incentive Bonus Stock Option Agreement provides for automatic exercise only where the purchase price falls within specific levels:

[7]      In addition, plaintiff quotes only a portion of section 4.2 in his opposing brief, leaving out the express condition that triggers automatic exercise in the contract clause.  Pl.'s Opp. Def.'s Mot. Summ. J. at 18:15-23.  Although plaintiff argues that he "gave express written consent for the company to automatically exercise the stock option purchases," plaintiff offers no evidence that Incentive Bonus Stock Option Agreement which contains the automatic provision was ever executed.  Therefore, plaintiff's argument that the provision reflects Daub's express written consent is without merit.

United States District Court

For the Northern District of California

Daub hereby accepts the foregoing option and agrees with Foxman and the Company that he will automatically be deemed to have exercised the option to purchase the Option Shares to the extent that the purchase price for the Option Shares (as determined below) shall be equal to the lesser of forty (40%) percent [sic] of the Bonus or the purchase price for the number of Option Shares at any time remaining available to be purchased without further notice (the "Annual Purchase"). However, in no event, shall Daub have an option to purchase . . . in excess of the Maximum Number of the Option Shares unless otherwise agreed by the Company and Foxman.

AC, Ex. 1 at 7-8 ¶ 4.2. Even assuming the Incentive Bonus Stock Option Agreement was executed, there is no evidence supporting that the automatic exercise provision was triggered by the condition precedent set forth in the contract.

In addition, there is no evidence that Daub has performed under the agreement. For example, an express term of the Incentive Bonus Stock Option Agreement is that Daub forego all other bonus plans. Daub does not dispute that he received some incentive bonus payments throughout his employment at Eagle. In addition, according to the form of agreement, Daub also had to agree to a two year covenant not to compete in exchange for the stock purchase. In sum, the court finds that there is no genuine issue of material fact as to the existence of an agreement under which Daub exercised his right to purchase Eagle stock pursuant to an Incentive Bonus Stock Option Agreement or as to Daub's performance thereunder.

Defendant also argues that Daub's compensation structure was revised via a September 20, 2002 letter from Leonard Foxman which, *inter alia*, added a commission component and deleted the option to purchase stock using earned incentive bonuses. Plaintiff contends he never accepted or signed the agreement with his new compensation structure and, therefore, it is not valid and his initial offer letter continued to be operative through the date his employment was terminated.[8] Under Illinois law, plaintiff need not have accepted or signed the letter revising his compensation

---

[8]     Notably, Daub argues that he was paid commissions one year late based on a date in the September 20, 2002 letter. He also argues that he is owed commissions under a provision in the September 20, 2002 letter because Eagle terminated his employment on December 1, 2004 so that he would not receive about $140,000 in bonuses and $1 million in commissions because he is entitled to an annual commission based on corporate profits to be paid on December 15th of each year. Pl.'s Opp. Def.'s Mot. Summ. J. at 8:18-21. According to the terms of the letter, Daub was to be paid the commission based on Eagle's corporate profit "for the fiscal year beginning on October 1, 2002" and is to be paid on December 15, 2002. As Eagle contends, the terms of this commission is unambiguous that it is only for the fiscal year beginning October 1, 2002 (and ending September 30, 2003), rather than an annual commission.

United States District Court

For the Northern District of California

1  structure.  Specifically, "[w]hen an employment agreement is terminable at will, it may be modified

2  by the employer as a condition of its continuance."  *Schoppert v. CCTC Int'l, Inc.*, 972 F. Supp. 444,

3  447 (N.D. Ill. 1997).  "This right to modify unilaterally at-will employment terms applies to

4  modifying compensation terms."  *Geary v. Telular Corp.*, 341 Ill. App. 3d 694, 698 (2003) (internal

5  quotations and citations omitted).  The at-will employee's continued performance serves as both

6  acceptance and consideration of the modification to the contract:

> Because the continuation of an at-will relationship cannot be taken for granted, if one
> party proposes a change to the terms of the contract and the other party nonetheless
> continues to perform as usual, the modification to the contract is deemed to be
> effective. The continued performance is seen as both acceptance and consideration.

9  *Schoppert*, 972 F. Supp. at 447; *see also Geary*, 341 Ill. App. 3d at 698 ("When an at-will employee

10 continues to work after a change in commission plan, he is deemed to have accepted the change.")

11 (citation omitted).[9]

12        In *Schoppert*, the employer unilaterally announced a change in commission structure and

13 began paying under the new structure.  *Schoppert*, 972 F. Supp. at 447.  The plaintiff employee

14 objected and complained about the new commission structure, but nevertheless accepted payments

15 thereunder.  *Id.*  The court found that the plaintiff's "continuing to work over two and one half years

16 while receiving commissions under the new structure must be seen in legal terms as an acceptance of

17 the [commission change], grudging and protest-filled as that acceptance may have been."  *Id.*  On the

18 other hand, the court concluded that an issue of fact was raised as to the effectiveness of another

19 unilateral compensation change made by the employer.  *Id.* at 449.  In that situation, the employer

20 proposed the change in a letter to the plaintiff employee seeking the employee's acceptance by

21 signature.  The employee never signed the letter.  In addition, the employer continued to operate

22

23 _____

24 [9]      To the extent plaintiff's argument is premised on his contention that his employment was not
   at-will, *see* Pl.'s Opp. at 18:7-10, the court has already concluded that his employment arrangement
25 is at-will.  *See supra* section II.B.  To the extent plaintiff relies upon an excerpt from the Incentive
   Bonus Stock Option Agreement that provides "[this instrument] may not be changed orally but only
26 by an agreement in writing signed by the party against whom enforcement of any waiver, change,
   modification, extension, or discharge is sought," AC, Ex. 1 at 16, the provision in the Incentive
27 Bonus Stock Option Agreement is clearly applicable only to that agreement and not to the separate
   offer letter.  The Incentive Bonus Stock Option Agreement form attached to the offer letter as an
28 exhibit merely showed the Incentive Bonus Stock Option Agreement available to Daub if he chose
   to execute it.

United States District Court

For the Northern District of California

1   under the old compensation plan while continuing negotiations with the plaintiff.  *Id.*

2          Here, the September 20, 2002 letter sought to inform Daub of the new structure of his

3   compensation plan in connection with the change in his role to vice president of western region

4   sales.  Larsen Decl., Ex. H at 399-403 (Daub Depo. Ex. 4).  It did not seek Daub's acceptance or

5   signature, and stated: "This offer supersedes all previous offers or arrangements, whether written or

6   verbal."  *Id.*  The new compensation structure became effective with the next fiscal year beginning

7   October 1, 2002.  The record indicates that Daub began receiving commissions which resulted from

8   the new compensation plan, and were not based on his previous compensation structure.  Decl.

9   Loretta Aidkonis Supp. Mot. Summ. J. ("Aidkonis Decl.") ¶¶ 7-9.  Daub began receiving these

10  commissions after September 2002.  Larsen Decl., Ex. D (Daub Depo.) 127:11-19.  The factual

11  record does not indicate that Daub refused the commission payments under the new compensation

12  structure, objected to his new title or the instruction to focus on the western region or otherwise

13  stopped performing.  Therefore, applying *Schoppert*, plaintiff's continuing to work and accepting of

14  payments under the new compensation structure constitutes legal acceptance of the new

15  compensation structure.[10]

16                    **3.    Recruiting Bonus**

17         Daub contends he is owed bonuses for introducing job candidates.  However, as Eagle

18  argues, Daub points to no evidence that any such bonus was earned by Daub in accordance with the

19  terms of the recruiting bonus in his offer letter.  Daub contends only that he "introduced such

20  candidates but was never given any documentation with such bonuses ever being paid" without

21  naming specific candidates and the status of such candidates' employment with Eagle on their one

22  year service date.  This is insufficient to support a claim that any recruiting bonus is owed, and

23  nothing in the record creates a genuine issue of material fact that such amounts are owed to Daub.

24  _____

25  [10]      Finally, to the extent plaintiff argues he never saw the letter, he does not dispute that he
    started receiving commissions which he had never received before.  In addition, defendant offers
26  evidence that Daub received a copy of the September 20, 2002 letter in his e-mail inbox based on the
    back up copy of Daub's computer drive made at the time Daub left Eagle.  *See* Adam J. Plummer
27  Decl. Supp. Def.'s Mot. Summ. J. ¶¶ 2-8.  According to the back up copy of Daub's e-mail inbox, a
    January 31, 2003 e-mail from Ted Foxman to Daub with the September 20, 2002 letter attached was
28  marked as read.  *Id.* ¶ 9.

ORDER GRANTING DEFENDANT EAGLE TEST SYSTEMS, INC.'S MOTION FOR SUMMARY JUDGMENT—No.
C-05-01055 RMW
SPT

**United States District Court**
For the Northern District of California

### 4.    Change of Control Provision

Plaintiff also contends that there is a genuine issue of material fact regarding whether he should have received severance benefits after his termination based on the change in control provision in his offer letter.  Specifically, he contends there is an issue of fact whether there was a change in control when TA Associates purchased sixty-two and one half percent of Eagle's outstanding capital stock and whether the termination of his employment without cause was a result of the change of control.  Plaintiff offers no support for this claim, contending instead that he is not able to show what documents support this claim at this time because, although he has requested minutes of the meetings of the board of directors with references to Daub or his position from defendant, he has not received such documents.  *See* Pl.'s Opp. at 16:27-17:2.[11]

Pursuant to the change in control/severance benefits provision in Daub's offer letter, "in order to protect the Employee's interests in the event of such a change [in control], the Company shall offer 'Severance Benefits' to the Employee in the event that Employee's employment is terminated as a result thereof."  AC, Ex. 1 at 4.  A change in control is defined as "a change of majority ownership or material change of corporate form which results in the establishment of a board of directors and places decisions regarding the operation of daily business matters and personnel management with the resulting corporate form."  AC, Ex. 1 at 4.[12]  Defendant points to, *inter alia*, the deposition testimony of Jameson Jones McJunkin, one of the TA Associates representatives on Eagle's board of directors.

According to McJunkin, he never recommended that Daub's position or responsibilities be changed or that Eagle terminate Daub's employment.  Larsen Decl., Ex. G (McJunkin Depo.) at

---

[11]     Defendant argues that it has produced its board minutes in discovery.  Defendant further argues that although plaintiff indicates that he has filed a motion to compel the board minutes, defendant was never served with such a motion, nor is such a motion reflected on the docket for the present action.  According to the docket, on October 25, 2006 plaintiff's filed a motion to compel responses to certain interrogatories and requests for documents, set for hearing before the magistrate judge on November 29, 2006.  *See* Docket Nos. 41, 42, 43.  However, that motion to compel does not include any requests for board minutes.

[12]     Plaintiff omits the requirement "and places decisions regarding the operation of daily business matters and personnel management with the resulting corporate form" in arguing that the evidence supports that there was a change of control.

ORDER GRANTING DEFENDANT EAGLE TEST SYSTEMS, INC.'S MOTION FOR SUMMARY JUDGMENT—No.
C-05-01055 RMW
SPT                                                                 13

United States District Court

For the Northern District of California

1  33:23-34:2; 40:14-18.  Although TA Associates held sixty-two and one half percent of the capital

2  stock of Eagle, voting on company matters was not weighted according to the amount of share

3  ownership of the board members.  *Id.* at 35:9-13.  Rather, TA Associates "has a history of being the

4  minority investor in the founder-owned companies." *Id.* at 35:13-15.  Its philosophy is to "not

5  interfer[e] with the day-to-day management of the company." *Id.* at 35:17-18.  McJunkin further

6  testifies that Ted Foxman had commented to him that Daub was not performing well relative to

7  expectations and that he had had a conversation with Daub to make that clear.  *Id.* at 41:1-11.

8  Subsequently, Ted Foxman informed McJunkin that Eagle was terminating Daub's employment.[13]

9  *Id.*

10      Based on this factual record, there is no genuine issue of material fact as to whether TA

11  Associates's investment in Eagle resulted in a change of control as defined in Daub's offer letter.

12  There is evidence that Eagle never placed decisions regarding Eagle's day to day business matters

13  and the management of personnel with the new corporate form, and no evidence showing that the

14  new board took over management of the day to day business and personnel matters.  The evidence

15  shows that Daub's employment was terminated for performance related reasons approximately

16  fourteen months after TA Associates's investment in Eagle.  In addition, the evidence indicates that

17  the decision to terminate Daub's employment was made by the Foxmans with no input from the TA

18  Associates representatives serving on Eagle's board.  There is no evidence that gives rise to an

19  inference that Daub's employment was terminated "as a result" of any purported change in control.

20      **C.      Age Discrimination Claim**

21      Eagle moves for summary judgment of Daub's claim that his employment was terminated on

22  the basis of his age in violation of the Fair Employment and Housing Act ("FEHA").  Under FEHA,

23  "[a] discharge is not 'on the ground of age' . . . unless age is a 'motivating factor' in the decision.

24  *West v. Bechtel Corp.*, 96 Cal. App. 4th 966, 978 (2002).  "[A]n employee claiming discrimination

25  must offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse

26  action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a

27

28      [13]      It is unclear from McJunkin's deposition testimony whether Ted Foxman informed only
        McJunkin or the entire board that he was terminating Daub's employment.

**United States District Court**
For the Northern District of California

1  combination of the two, such that a reasonable trier of fact could conclude the employer engaged in

2  intentional discrimination."

3            **1.    Evidence of Pretext**

4            "California has adopted the three-stage burden-shifting test established by the United States

5  Supreme Court for trying claims of discrimination, including age discrimination, based on a theory

6  of disparate treatment." *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 354 (2000).  The three-stage

7  burden-shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973),

8  provides that once plaintiff has set forth a *prima facie* showing of discrimination, the burden shifts to

9  the defendant to "articulate some legitimate, nondiscriminatory reason" for the employment decision

10  at issue.  "Then, in order to prevail, the plaintiff must demonstrate that the employer's alleged reason

11  for the adverse employment decision is a pretext for another motive which is discriminatory."

12  *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994).  In a summary judgment motion, "[i]f a

13  rational trier of fact could, on all the evidence, find that the employer's action was taken for

14  impermissibly discriminatory reasons, summary judgment for the defense is inappropriate." *Id.*

15            Here, defendant appears to concede that plaintiff has established a *prima facie* case.  *See*

16  Def.'s Mot. Summ. J. at 14-19.  Rather, defendant argues that Eagle terminated Daub's employment

17  due to his poor performance and Daub has not offered evidence that this reason is pretextual.  Eagle

18  points out that it had twice reduced Daub's responsibilities, namely, from overseeing world wide

19  sales, to North America sales, and then only to sales in the western region, due to lack of

20  performance.  Larsen Decl., Ex. E (Leonard Foxman Depo.) at 97:8-99:10.  In the latest reduction of

21  responsibilities, Daub began reporting to a salesperson who had previously reported to Daub.

22  Larsen Decl., Ex. F (Ted Foxman Depo.) at 60:6-19, 61:1-62:2; Larsen Decl., Ex. D (Daub Depo.) at

23  117:2-16, 150:9-15.  In opposition, plaintiff argues that he has established a *prima facie* case of age

24  discrimination.  However, plaintiff does not offer sufficient evidence that the legitimate,

25  nondiscriminatory reason offered by defendant is pretextual.  To the extent the defendant articulates

26  legitimate, nondiscriminatory reasons, "a plaintiff cannot defeat summary judgment simply by

27  making out a *prima facie* case":

28            The plaintiff must do more than establish a prima facie case and deny the credibility

ORDER GRANTING DEFENDANT EAGLE TEST SYSTEMS, INC.'S MOTION FOR SUMMARY JUDGMENT—No.
C-05-01055 RMW
SPT                                                                                    15

United States District Court

For the Northern District of California

1
2
3

of the defendant's witnesses.  In response to the defendant's offer of nondiscriminatory reasons, the plaintiff must produce specific, substantial evidence of pretext.  In other words, the plaintiff must tender a genuine issue of material fact as to pretext in order to avoid summary judgment.

*Wallis*, 26 F.3d at 890 (citations and internal quotations omitted).

4
5
6
7
8
9
10
11
12
13
14
15
16
17

To support that defendant's articulated nondiscriminatory reason was pretext, plaintiff contends that his good performance is evidenced by the increase in Eagle's sales during his employment from $23 million in 2001 to over $111 million in 2004.  Daub Decl. ¶ 5 ("as Vice President of Sales and Marketing for Eagle Test Systems, I was instrumental in increasing sales from $23 million in 2001 to over $111 million in 2004").  Daub offers the testimony of Thomas Mordue, formerly employed at Eagle as director of Asian sales and strategic accounts manager for Northern California.  Bohn Decl., Ex. 4 (Mordue Depo.) at 13:4-8.  Mordue testified that he had worked with Daub for twelve and a half years at LTX prior to working at Eagle, and then worked with Daub for over a year at Eagle.  *Id.* at 44:12-17.  He testified that Daub is always at work first in the morning and the last to turn off the lights, that "[h]e tracks every detail," "[h]e helped me with everything I needed," "[h]e led by example," and "[h]e's the sales VP in the industry."  *Id.* at 44:24-45:9.  Daub also offers the deposition testimony of Mike Harris, who first met Daub in May 2006.[14] Bohn Decl., Ex. 2 (Harris Depo.) at 29:6-20.  Harris testifies that he had heard that Daub "was a legend in the field" and "was the sales guru" at LTX and "was very good at his job."  *Id.* at 29:6-20.

18
19
20
21
22
23
24
25
26

The testimony which Daub points to is insufficient to raise a genuine issue that defendant's articulated reason that Daub was terminated for his poor performance at Eagle was pretextual.  Mordue was not even employed at Eagle during the last year and one-half or so of Daub's employment.  Further, Mordue's testimony about Daub's performance was limited to the help Daub provided Mordue and Daub's record keeping.  It did not include anything about Daub's overall performance, his maintenance of old clients or development of new ones.  Moreover, evidence in the record indicates that Len Foxman had complained about Daub's performance prior to termination of his employment.  According to David Miller to whom Daub reported during some portion of his

27
28

---

[14]     Harris' role and relationship to Daub is unclear from the deposition testimony excerpt submitted in support of Daub's opposition to defendant's motion for summary judgment.

**United States District Court**
For the Northern District of California

1   employment[15], Len Foxman complained to him that Daub was not effective, was not hiring new

2   people fast enough, and was not bringing in new accounts.  Bohn Decl., Ex. 3 (Miller Deop.) at

3   55:9-56:16.  Harris did not even meet Daub until May of 2006, approximately two years after Daub's

4   employment at Eagle had ended.

5              **2.        Evidence of Employer Acted With A Discriminatory Animus**

6              Defendant's argument that the evidence does not support a showing that the decision to

7   terminate Daub's employment was motivated by discriminatory animus is twofold.  First, defendant

8   argues that although plaintiff has pointed to purportedly ageist comments, such comments do not

9   overcome the "same actor presumption" that there is no discriminatory motive.  Second, defendant

10  contends that those purportedly ageist comments were stray remarks insufficient to show that age

11  was a motivating factor for termination of Daub's employment.

12             In California, "where the same actor is responsible for both the hiring and the firing of a

13  discrimination plaintiff, and both actions occur within a short period of time, a strong inference

14  arises that there was no discriminatory motive."  *Horn v. Cushman & Wakefield Western, Inc.*, 72

15  Cal. App. 4th 798, 809 (1999).  Although the passage of time generally would attenuate this

16  presumption, under California case law, four years is still considered a short time and "is not so long

17  a time as to attenuate the presumption."  *Id.* (holding that five years is a relatively short time and not

18  so long as to attenuate the presumption).  Here, the parties do not dispute that Leonard Foxman

19  made the decisions to hire Daub and to terminate Daub's employment.  Daub was sixty-four years

20  old at the time he was hired, and sixty-eight when his employment was terminated four years later.

21  There is no dispute that Leonard Foxman is eight years younger than Daub.  When Daub's role was

22  changed to vice president of western region sales, his prior role of vice president of North America

23  was filled by the promotion of a sixty year old sales person.  Larsen Decl., Ex. D (Daub Depo.) at

24  117:2-16; Aidikonis Decl. ¶ 13.  Although Daub points to remarks made by Foxman, at least one of

25  those remarks was directed at both Foxman and Daub together, namely, "Ah, we're too old for this,

26  huh, Ken?  We're getting too g------ old for this."  Based on the factual record, the evidence of ageist

27  

28  [15]     Miller was formerly employed at Eagle as director of North American sales and eastern region manager.

ORDER GRANTING DEFENDANT EAGLE TEST SYSTEMS, INC.'S MOTION FOR SUMMARY JUDGMENT—No.
C-05-01055 RMW
SPT                                                   17

1  remarks tendered by Daub does not overcome the same actor presumption of no discriminatory

2  motive. *Cf. Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 464 (6th Cir. 1995) (observing that

3  "[i]n discrimination cases where the employee's class does not change, it remains possible that an

4  employer who has nothing against women per se when it hires a certain female will have nothing

5  against women per se when it fires that female, regardless of the number of years that pass.")

6        Similarly, the allegedly ageist comments that plaintiff points to fail to demonstrate that

7  Leonard Foxman's decision to terminate his employment was motivated by age animus.  First, only

8  one comment appears to be directed toward Daub, namely, that Leonard Foxman stated Daub is

9  made up of "cuts and jumpers."  This comment was made about two years prior to the date Foxman

10  terminated Daub's employment.  Second, as noted above, another comment was directed toward both

11  Foxman himself and Daub.  The record does not establish that this comment was made close to the

12  date Daub's employment was terminated.  *See Horn*, 72 Cal. App. 4th at 810 (citing *Smith v.

13  Firestone Tire and Rubber Co.*, 875 F.2d 1325, 1330 (7th Cir. 1989) (holding that "stray

14  remarks, . . . when unrelated to the decisional process, are insufficient to demonstrate that the

15  employer relied on illegitimate criteria, even when such statements are made by the decision-maker

16  in issue")).  Third, the comment made by Leonard Foxman about one year before Daub was let go

17  that a sales manager candidate was too old to be effective at Eagle if he was retired from

18  Schlumberger is of marginal relevance and does not suggest that Daub was fired because of his age.

19  The comment more likely reflects the reality that someone who had worked for years for another

20  company and chose to retire was not likely to still have sales contacts and the desire to make him a

21  promising candidate for a position at another company.  *See Birbeck v. Marvel Lighting Corp.*, 30

22  F.3d 507, 512 (4th Cir. 1994).  Further, the comment was remote in time to Daub's employment

23  termination.  *Id.*

24        Daub also argues that Eagle had terminated other employees based on age.  Pl.'s Opp. at 9:9-

25  16.  First, David Miller, a sales manager, was terminated from employment after four years at Eagle,

26  prior to his pension vest date.  Bohn Decl., Ex. 3 (Miller Depo.) at 34:18-20.  Miller was about

27  sixty-two years old when his employment was terminated.  Miller testified that Leonard Foxman

28  promised him four weeks of severance pay when his employment was terminated, but never paid the

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

severance. *Id.* at 38:6-18; 39:20-21. Second, according to Daub's deposition testimony, Ted Foxman asked Daub to terminate Blaser's employment for lack of performance. Bohn Decl., Ex. 1 at 38:11-19. Blaser worked at Eagle for five years and was sixty-five years old at the time his employment was terminated. *Id.* at 38:20-21. Blaser reported to Miller and Milller's boss was Ted Foxman. *Id.* at 40:5-8. Ted Foxman commented to Daub that Blaser "is too old to be effective at Eagle Test Systems." *Id.* at 38:15-17. In addition, Daub testified that Ted Foxman asked him to terminate Blaser's employment prior to Blaser's fifth anniversary because "it would cost the company a whole lot of money if we didn't get him out of here before his fifth year." *Id.* at 39:11-17.

However, these facts are not sufficient to show the existence of age animus or that Eagle's termination of Daub's employment was motivated by discriminatory animus based on age. Although Daub testified that Ted Foxman, not Leonard Foxman, commented that Blaser was too old to be effective at Eagle, Daub also testified that Ted Foxman asked him to terminate Blaser for lack of performance. *Id.* at 38:11-12. In addition, Daub testified that on at least on three prior occasions, Ted Foxman had complained of Blaser's performance to Daub, expressing concerns that he was not getting a full day's work out of Blaser and that Blaser was not generating enough business. *Id.* at 40:9-17; 41:20-23.

Daub's contention that there is age animus on Eagle's part because it purportedly aims to terminate employees' employment prior to the vesting of benefits on their fifth anniversary, such as in Miller's case, is not persuasive. According to the record, the pension, profit-sharing, and ESOP benefits offered by Eagle did not vest based on the age of an employee, but rather on the fifth anniversary of employment regardless of age. Moreover, Daub testified that Blaser's employment was actually not terminated until four months after the conversation between Ted Foxman and Daub, and after Blaser's fifth anniversary and the vesting of his benefits. *Id.* at 42:1-25. Further, in Daub's case, Eagle characterized Daub's firing as a retirement and amended its ESOP plan to permit Daub to vest even though he had not met the five year vesting period.

ORDER GRANTING DEFENDANT EAGLE TEST SYSTEMS, INC.'S MOTION FOR SUMMARY JUDGMENT—No. C-05-01055 RMW
SPT

19

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

### III.  ORDER

For the foregoing reasons, the court GRANTS Eagle's motion for summary judgment.

DATED:        12/21/06

RONALD M. WHYTE
United States District Judge

ORDER GRANTING DEFENDANT EAGLE TEST SYSTEMS, INC.'S MOTION FOR SUMMARY JUDGMENT—No.
C-05-01055 RMW
SPT

1  **Notice of this document has been electronically sent to:**

2  **Counsel for Plaintiff:**

3  Robert Herbert Bohn Snr.      bbohn@bohnlaw.com

4
   **Counsel for Defendants:**
5
   Ryan James Larsen            ryan.larsen@kattenlaw.com
6

7

8
   Counsel are responsible for distributing copies of this document to co-counsel that have not
9  registered for e-filing under the court's CM/ECF program.

10

11 **Dated:** _____12/21/06_____            _____SPT_____
                                               **Chambers of Judge Whyte**
12

**United States District Court**
For the Northern District of California

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER GRANTING DEFENDANT EAGLE TEST SYSTEMS, INC.'S MOTION FOR SUMMARY JUDGMENT—No.
C-05-01055 RMW
SPT                                          21